UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

SYLVESTER I. PAYNE,                       )
                                          )
                    Plaintiff,            )        Case  No. CV10-9600 AJW
                                          )
        v.                                )
                                          )        MEMORANDUM OF DECISION
MICHAEL J. ASTRUE,                        )
Commissioner of the Social                )
Security Administration,                  )
                                          )
                    Defendant.            )
_____   )

Plaintiff filed this action seeking reversal of the decision of defendant, the Commissioner of the Social Security Administration (the "Commissioner"), denying plaintiff's application for supplemental security income ("SSI") benefits.  The parties have filed a Joint Stipulation ("JS") setting forth their contentions with respect to each disputed issue.

**Administrative Proceedings**

The parties are familiar with the procedural facts, which included a prior order remanding this case to the Commissioner for further administrative proceedings. [See JS 2-3]. In a March 17, 2010 written hearing decision that constitutes the final decision of the Commissioner, an administrative law judge ("ALJ") found that plaintiff had severe impairments consisting of a hypertension, depression, history of collapsed left lung, diabetes mellitus, and history of gunshot wound. The ALJ further found that plaintiff retained the residual functional capacity ("RFC") to perform medium work that was "limited to simple 2-3

1  repetitive steps with no public contact and only occasional peer contact." The ALJ concluded that plaintiff
2  was not disabled because his RFC did not preclude him from performing work that exists in significant
3  numbers in the national economy. [See JS 2-4; Administrative Record ("AR") 294-304].

**Standard of Review**

5       The Commissioner's denial of benefits should be disturbed only if it is not supported by substantial
6  evidence or is based on legal error. Stout v. Comm'r Social Sec. Admin., 454 F.3d 1050, 1054 (9th Cir.
7  2006); Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002). "Substantial evidence" means "more than
8  a mere scintilla, but less than a preponderance." Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1 (9th Cir.
9  2005). "It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."
10 Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005)(internal quotation marks omitted). The court is
11 required to review the record as a whole and to consider evidence detracting from the decision as well as
12 evidence supporting the decision.  Robbins v. Soc. Sec. Admin, 466 F.3d 880, 882 (9th Cir. 2006);
13 Verduzco v. Apfel, 188 F.3d 1087, 1089 (9th Cir. 1999). "Where the evidence is susceptible to more than
14 one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld."
15 Thomas, 278 F.3d at 954 (citing Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 599 (9th Cir.1999)).

**Discussion**

**Mental impairment**

18      Plaintiff contends that the ALJ improperly evaluated the severity of plaintiff's mental impairment.
19 [JS 4-14].

20      Treatment records from the Los Angeles County Department of Mental Health indicate that plaintiff,
21 who was then 44 years old, was brought to the West Central Mental Health Clinic ("West Central MHC")
22 by his parents in February 2005 for reported symptoms of hearing voices and bells ringing, problems with
23 anger, crying spells, and difficulty sleeping. [AR 25, 156-157].  The "crisis contact" evaluation states that
24 plaintiff is "very suspicious, even of family members." [AR 156].  Plaintiff lived with his mother and "is
25 supported by family members." [AR 156].  Plaintiff was reported to have been shot in the head in 1997, and
26 the "[b]ullets were not removed because the particles were too close to the brain." [AR 156].  The diagnoses
27 were dementia secondary to head trauma with behavioral problems and bipolar disorder with psychotic
28 features.  Plaintiff was prescribed Abilify (aripiprazole), an antipsychotic that also can be used to treat

depression[1], Topamax (topiramate), an anticonvulsant[2], and the antidepressants trazadone[3] and Lexapro[4]. The examining physician assigned plaintiff a Global Assessment of Function ("GAF") score of 40, denoting some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood.[5]

Plaintiff attended medication follow-up visits at West Central MHC through June 2005, when plaintiff's prognosis was described as "poor." [AR 148].  Plaintiff and his mother initially reported that he felt "calm" on medications, had less ringing in the ears, and was sleeping well. Subsequently, however, plaintiff reported that he had problems obtaining medication refills and had noticed an increase in mood swings, irritability, and sleep problems when he was off his medication. [AR 149-153].

In October 2005, plaintiff underwent a consultative psychological evaluation with Dr. Rosa Colonna at the Commissioner's request. Dr. Colonna took a history, administered psychological tests, and conducted a mental status examination.  She did not review any treatment records.  [AR 162-167]. Dr. Colonna

---

[1]   See www.abilify.com (last accessed Dec. 29, 2011).

[2]   See http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000998/ (last accessed Dec. 29, 2011).

[3]   See http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000530/ (last accessed Dec. 29, 2011).

[4]   See http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000998/ (last accessed Dec. 29, 2011).

[5]   The GAF score is a "multiaxial" assessment that reflects a clinician's subjective judgment of a patient's overall level of functioning by asking the clinician to rate two components: the severity of a patient's psychological *symptoms,* or the patient's psychological, social, and occupational *functioning*. The GAF score is the lower of the symptom severity score or the functioning severity score.  A GAF score of 41 through 50 denotes serious symptoms, such as suicidal ideation or severe obsessional rituals, or any serious impairment in social, occupational, or school functioning, such as the absence of friends or the inability to keep a job.  See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders Multiaxial Assessment 30, 34 (4th ed. text rev. 2000); see also Vargas v. Lambert, 159 F.3d 1161, 1164 (9th Cir. 1998)(describing a GAF score as "a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment").

described plaintiff as "generally non-cooperative with psychometric testing in a passive aggressive manner. He refuses two portions of the examination stating that he cannot do them.  Most of his responses are 'I don't know' or 'I don't remember.' . . . His overall demeanor and presentation is inconsistent with his history and psychometric testing processes." [AR 162].  Plaintiff gave a history of a gunshot wound to the head in 1995, which resulted in gunshot pellets being permanently lodged in his head.  Plaintiff described having auditory hallucinations and headaches.  He said his medications were helpful.  He reported living with his mother and eight-month old son, whose mother had died.  Plaintiff said that he was placed in special education classes and last worked about 13 years earlier, as a cook. [AR 163].

In addition to noting plaintiff's poor effort and "gross exaggeration" on mental status examination, Dr. Colonna observed that plaintiff exhibited mild psychomotor slowing; "borderline to low average" intellectual functioning; mildly dysthymic mood; slightly constricted affect; no hallucinations or other "obvious psychotic indicators" at the time of the examination; mildly diminished memory, attention, and concentration; low fund of knowledge; and poor insight and judgment. [AR 164-166].  On the Wechsler Adult Intelligence Scale-III ("WAIS-III"), plaintiff achieved a verbal IQ score of 61, a performance IQ score of 60, and a full scale IQ score of 58. [AR 165].  Plaintiff refused to undertake the Bender-Gestalt Test-II and the Trails Making Test, Parts A and B, telling Dr. Colonna "I cannot do this." [AR 165].

Dr. Colonna's "probable" diagnoses were "mood disorder not otherwise specified," "consider malingering per effort on psychometric testing which is inconsistent with overall activities of daily living and presentation, rule out borderline intellectual functioning," and "consider personality disorder not otherwise specified with dependent and narcissistic traits." [AR 166]. Dr. Colonna concluded that plaintiff's "overall cognitive ability" was no more than borderline to low average range. [AR 166]. She opined that plaintiff would be able to understand, remember and carry out "short, simplistic instructions without difficulty" and make "simplistic work-related decisions without special supervision." [AR 166].  He had a "mild inability" to understand, remember, and carry out and make detailed instructions.  He was "generally socially appropriate with the examiner" but "in the competitive job market, he presents with a mild inability to interact appropriately with supervisors, coworkers and peers. [AR 166]. Dr. Colonna concluded that although plaintiff's examination results did not reflect his "true ability," plaintiff nonetheless "may have an underlying mood disturbance that would benefit from continuation of outpatient mental health treatment

services and alleged psychotropic medication." [AR 167].

Dr. Dudley, a nonexamining state agency physician, completed a mental RFC assessment form and a psychiatric review technique form ("PRTF") in November 2005. [AR 176-195]. He reviewed plaintiff's mental health treatment records as well as Dr. Colonna's examination report from a month earlier. On the PRTF, Dr. Dudley could have indicated that plaintiff's impairment was not severe, but he did not check that box. Instead, he indicated that plaintiff had a severe impairment, necessitating an RFC assessment. [AR 180, 190]. See 20 C.F.R. 416.920a(d)(3) ("If we find that you have a severe mental impairment(s) that neither meets nor is equivalent in severity to any listing, we will then assess your residual functional capacity."). Dr. Dudley indicated that due to the presence of one or more organic mental disorders, psychotic disorders, and affective disorders, plaintiff had a "moderate" restriction in activities of daily living, "moderate" difficulties in maintaining social functioning, and "moderate" difficulties in maintaining concentration, persistence, or pace. The existence of "moderate" restrictions in those three functional areas signifies a severe mental impairment. Cf. 20 C.F.R. 416.920a(d)(i)(stating that a claimant with no restrictions or "mild" restrictions in those three functional areas generally will not be found to have a severe mental impairment). Dr. Dudley did not indicate a rating for episodes of decompensation. [AR 190]. Among other things, Dr. Dudley noted that during a September 2005 physical examination, the Commissioner's consultative internist noted a scar on plaintiff's head (which was described by Dr. Mark Borigini as "a well healed scar in the left scalp area above the ear. One can also feel the shotgun pellets underneath the scalp." [AR 159]). Dr. Dudley suggested that this "may account for a decrease in memory, as determined [by] West Central Mental Health that gives the claimant a diagnosis of dementia secondary to a gunshot wound to the head." [AR188].

On the mental RFC form, Dr. Dudley indicated that plaintiff was moderately limited in the ability to understand and remember detailed instructions and in the ability to maintain attention and concentration for extended periods, but not significantly limited in other work-related functional abilities. [AR 176-177]. Dr. Dudley indicated that plaintiff could perform "short and simple" tasks. [AR 178].

Additional treatment records from West Health MHC indicate that plaintiff continued to receive mental health treatment from that facility from 2005 through 2007. He continued on his medication regimen and also attended therapy sessions. [AR 196-217, 437-446]. In January 2007, Dr. Elizabeth Grigor

completed a mental RFC questionnaire stating that plaintiff had been treated at West Central MHC since February 2005, and that she had been seeing him monthly since September 2006. [AR 212-217]. She gave plaintiff a diagnosis of dementia due to head trauma and a GAF score of 45, signifying serious symptoms or a serious impairment in social, occupational, or school functioning. [AR 212]. See note 5 supra. [AR 212]. Dr. Grigor opined that plaintiff was "unable to sustain work" for an indefinite period of time. [AR 212]. She said that his "major head trauma" exacerbated his "dementia and mental illness," and that his medications caused sleepiness, dry mouth, nausea, and dizziness. [AR 212]. She said that plaintiff was not a malingerer, and that he exhibited numerous signs and symptoms of mental illness, including, among others, anhedonia, blunt, flat, or inappropriate affect, easy distractability, emotional withdrawal or isolation, mood disturbance, and memory impairment. [AR 213-214].

Dr. Grigor opined that plaintiff's impairments caused numerous "moderate" and "marked" limitations in work-related functional abilities and would cause him to miss work more than four days per month. [AR 215-216]. She noted that plaintiff's mother was his primary caretaker, and that he had a "current history of 1 or more years' inability to function outside a hughly [sic] supportive living arrangement with an indication of continued need for such an arrangement." [AR 217].

During the May 2007 hearing, plaintiff was represented by counsel and testified on his own behalf. Plaintiff said that he continued to undergo treatment with his "psych doctor" at West Central MHC. [AR 273-275; see also AR 80-81, 437-446]. Plaintiff testified that he saw Dr. King because he was hearing "ringing and stuff," had "bad dreams," and did not "like being around people." [AR 274]. Plaintiff admitted that he had missed a few appointments because he "forgot." [AR 274]. He said that his mother helped him take his medications. [AR 274]. Plaintiff said that when he went to his psychiatrist, both he and his mother talked to the doctor. [AR 274-275]. Asked why his mother went with him to his appointments, plaintiff replied, "Cause I don't understand, I don't know. I don't understand. . . . [W]hen they ask me stuff I don't understand it sometimes, you know, a lot of times. . . . She explains it to me." [AR 275]. Plaintiff also testified that his son's mother was dead, that he had not known that she used drugs while pregnant, and that his son had to be detoxified from cocaine as an infant until his mother took the baby to the doctor. [AR 268, 270]. He testified that his mother had custody of his son. [AR 268, 270].

On December 10, 2007, plaintiff returned to West Central MHC. [AR 437]. Plaintiff told a social

worker that he had not seen a doctor for at least five months and was interested in getting back into treatment. Plaintiff told the social worker that he was "doing well" and had gone "to Vegas for a while," but that he was currently living with his mother and son again, and that "in order to get disability he needs to be seeking treatment." [AR 437]. Plaintiff also said that he had bad headaches and sleep problems. [AR 437].

Carolyn Mohr, M.D. evaluated plaintiff at West Central MHC on December 16, 2007. [AR 416]. Plaintiff reported having seizures and severe headaches, auditory hallucinations, persistent intrusive recollections of being shot in the head, depression, poor memory and concentration, and fear of being around people. Plaintiff said that he had been getting medication in Las Vegas but moved back to Los Angeles and was out of medication. A mental status examination revealed depressed mood and affect and poor memory. Dr. Mohr did not provide a diagnosis or functional assessment. She renewed and adjusted plaintiff's prescriptions for Abilify, Lexapro, trazodone, and topiramate and instructed him to return in two months. [AR 416].

During the hearing on remand in June 2009, plaintiff was represented by counsel and testified on his own behalf. [AR 309-332]. Plaintiff said that his headaches were worse, and that he took medication for blood pressure and diabetes, and other medications to "calm" him. [AR 316-317]. Plaintiff said that he would not remember to take medications if his mother did not organize it for him. [AR 318]. Plaintiff reported that he was still receiving mental health treatment, and that it helped him "in a way" by keeping him calm. [AR 318-319]. Plaintiff testified that he did not go to social functions, spent time in his backyard with his dog, and occasionally went to church with his mother. [AR 319-320]. Plaintiff said that his mother did all of the household chores and handled the money plaintiff received from general relief. [AR 322]. Plaintiff denied using alcohol or street drugs. [AR 323].

The ALJ ordered an additional consultative psychological examination, which was conducted by Jeannette Townsend, Ph.D.. on July 31, 2009. [AR 331, 476-482]. Dr. Townsend elicited a history, conducted a mental status examination, administered several tests, and reviewed mental health treating and examining records. Dr. Townsend characterized plaintiff as a "questionable historian" who made "suboptimal effort." [AR 476]. Dr. Townsend noted that plaintiff's work pace and response time were slow. [AR 476-477]. His mood was depressed, and he appeared anxious. His thinking was "limited in complexity

7

and detail," his problem solving was "not well organized or effective," his stream of consciousness was "restricted in productivity," he could not interpret the proverb "don't cry over spilled milk," and he displayed difficulty finding similarities between objects.  Plaintiff reported auditory hallucinations of "God talking to him," but he did not exhibit obvious psychosis or appear to be responding to internal stimuli.  His immediate and remote memory was fair, and his intermediate memory for daily activities was adequate. Judgment and insight were limited.  His general attention was "variable," and he was easily distracted.  He had difficulty with tasks involving focused attention and concentration.  Plaintiff's intellectual functioning was in the "borderline range," with a low fund of information and limited vocabulary. [AR 478].

On the WAIS-III, plaintiff obtained a verbal IQ of 59, a performance IQ of 52, and a full scale IQ of 51, placing him in the "mildly retarded range." [AR 479].  Plaintiff's scores on the Wechsler Memory Scale-III were "very low" and "consistent with poor memory"; however, his "level of attention and motivation may have diminished his scores." [AR 479].  His standard score on the Bender-Gestalt Test-II was low. [AR 480].  On the Trails Making Test, Part A, plaintiff took much longer than average for his age, and he was unable to understand how to perform Part B of that test.  On the Test of Memory Malingering, plaintiff's score was lower than obtainable by chance alone, indicating that "his effort was diminished and the scores are not valid." [AR 480]. On the Minnesota Multiphasic Personality Inventory II ("MMPI"), plaintiff was able to read only about half of the words on his own; his mother had to read the test items to him.  Plaintiff's score on Scale F indicated an invalid profile, which "can be associated with an inability to understand the questions," "emphasis on pathology," or "confusion." Plaintiff's MMPI profile could not be interpreted because of lack of validity. [AR 480]. Dr. Townsend concluded that plaintiff's test results "represent a minimum estimate of [plaintiff's] functioning level." [AR 480].

Dr. Townsend's diagnostic impression was depressive disorder with anxiety and psychotic features and cognitive disorder with impairment in memory. Plaintiff's intellectual functioning was in the borderline range.  [AR 480].  Dr. Townsend gave plaintiff a GAF score was 50, denoting serious symptoms or occupational impairment. [AR 481]. See note 5 supra.  Dr. Townsend concluded that plaintiff

is able to understand simple and some detailed instructions.  He would not understand more detailed or complex instructions.  He was able to do a simple, repetitive task for short periods of time during the evaluation. His motivational level interfered with more sustained

concentration and effort. [Plaintiff's] tendency to become irritated and oppositional would
interfere with his ability to accept instructions from supervisors and to interact appropriately
with coworkers and the public. [Plaintiff's] interview behavior and test results are the type
which can be associated with a person who has actual cognitive limitations and psychiatric
symptoms but who feels it is necessary to present himself as more disabled.

[AR 481]. Dr. Townsend also opined that plaintiff is not capable of managing funds. [AR 481].

On the first page of a checklist form appended to her narrative report, Dr. Townsend indicated that plaintiff had no limitation in the ability to understand and remember simple instructions; mild limitation in the ability to make judgments on simple work-related decisions; moderate limitation in the ability to carry out simple instructions and to understand and remember complex instructions; and marked limitation in the ability to make judgments on complex work-related decisions. [AR 483]. The second page of that report (containing items (2) through (5)) is missing from the record; the third page states that plaintiff cannot handle funds in his own best interest. [AR 483-484].

In finding plaintiff "limited to simple 2-3 repetitive steps with no public contact and only occasional peer contact," the ALJ rejected Dr. Grigor's treating source opinion, which was controverted by the examining and nonexamining source opinions. [AR 300]. The ALJ said that he gave the most weight to Dr. Dudley's nonexamining source opinion that plaintiff had moderate limitations in understanding and remembering detailed instructions and maintaining attention and concentration for extended periods, but was not significantly limited in mental functional abilities and could perform "short and simple tasks." [AR 300-301; see AR 176-178]. The ALJ concluded that Dr. Dudley's opinion was "most consistent with the entire medical evidence of record." [AR 301]. The ALJ also said that he relied on Dr. Townsend's opinion. [AR 301]. The ALJ evidently credited Dr. Townsend's opinion that plaintiff had limitations interacting with supervisors, coworkers, and the public, as those restrictions were absent from Dr. Dudley's opinion.

The ALJ must provide clear and convincing reasons, supported by substantial evidence in the record, for rejecting an uncontroverted treating source opinion. If contradicted by that of another doctor, a treating or examining source opinion may be rejected for specific and legitimate reasons that are based on substantial evidence in the record. Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004); Tonapetyan v. Halter, 242 F.3d 1144, 1148-1149 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830-831

(9th Cir. 1995). The opinion of a non-examining physician normally is entitled to less deference than that of an examining and treating physician precisely because a non-examining source does not have the opportunity to conduct an independent examination and does not have a treatment relationship with the claimant.  See Andrews v. Shalala, 53 F.3d 1035, 1040-1041 (9th Cir. 1995).

The ALJ permissibly rejected Dr. Grigor's disability opinion because it was not supported by clinical data, objective findings, or her own treatment notes.  In general, the existence of a mental impairment is established by medical evidence consisting of "pertinent signs, symptoms, and laboratory findings."  20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1); see 20 C.F.R. §§ 404.1508, 416.908.  Symptoms are the claimant's description of his or her impairment, while psychiatric signs are medically demonstrable and observable phenomena which indicate specific abnormalities of behavior, affect, thought, memory, orientation, and contact with reality. Medically acceptable laboratory findings include psychological test results.  20 C.F.R. §§ 404.1528(b)&(c); 416.928(b)&(c); see 20 C.F.R. §§ 404.1520a(b), 416.920a(b) (evaluation of mental impairments).   As the ALJ noted, the evidence cited by Dr. Grigor for her disability opinion was a checklist of "symptoms and signs."  [See AR 212-214].  However, none of the treatment reports from West Central MHC, including Dr. Grigor's reports, contain the results of a standard mental status examination documenting abnormal signs indicative of a disabling mental impairment.  On her September 7, 2006 progress note, Dr. Grigor noted that a "complete" mental status examination was needed [AR 208 (emphasis in original)], but neither her notes nor those of other West Central MHC providers contain complete mental status examination findings.  See Bayliss, 427 F.3d at 1217 (noting that an ALJ need not accept a physician's opinion that is conclusory and inadequately supported by clinical findings).[6]

The ALJ also was entitled to discredit Dr. Grigor's disability opinion because her progress notes indicate that she actually saw plaintiff only twice, and because her notes do not document clinical findings or other medical evidence corroborating the severity of the signs, symptoms, medication side effects, or

---

[6]   Dr. Grigor also said that plaintiff was dependent on the supportive living environment provided by his mother.  As noted above, however, plaintiff subsequently told a West Central MHC social worker that he had gone to Las Vegas for a period of time, had not seen a doctor for several months, and had been "doing well," but that he had returned to Los Angeles to live with his mother and was interested in resuming treatment because he needed to be in treatment to received disability benefits. [AR 416, 437].

functional limitations portrayed in her disability opinion.  [See AR 197 (1/16/07—no examination; SSI paperwork completed); AR 199 (12/6/06–plaintiff did not show up for appointment); AR 203 (10/30/06–plaintiff was in no acute distress, had no medication reactions or side effects, and exhibited no delusions or suicidal ideation); AR 206 (10/5/06–plaintiff did not show up for appointment); AR 208 (9/7/06–plaintiff's complained of decreased memory, concentration, and attention, but reported improvement in mood, sleep, and anger level; medication reactions or side effects "none"). See Bayliss, 427 F.3d at 1217 (holding that the ALJ properly rejected a treating physician's opinion that was contradicted by the doctor's treatment notes); Connett v. Barnhart, 340 F.3d 871, 874-875 (9th Cir. 2003) (holding that the ALJ did not err in rejecting the controverted opinion of a treating physician whose restrictive functional assessment was not supported by his treatment notes).

The ALJ also provided specific, legitimate reasons based on substantial evidence for what could be characterized as a partial rejection of Dr. Townsend's opinion.  Dr. Townsend concluded that plaintiff could understand and remember simple, but not complex, instructions, and that he was limited in his ability to interact with supervisors, coworkers, and the general public. These limitations were incorporated into the RFC assessed by the ALJ.  Dr. Townsend also indicated that plaintiff had "moderate" limitations in *carrying out* simple instructions, citing in her narrative report his ability to perform simple, repetitive tasks only for "short periods of time during the evaluation." [AR 481, 483].  The ALJ permissibly rejected that limitation in view of evidence that plaintiff was malingering.  [See AR 302].  More specifically, Dr. Townsend said that plaintiff put forth suboptimal effort during his examination, exhibited a lack of motivation, and had some invalid test results.  [AR 302 (citing AR 476, 480)].  She concluded that plaintiff's test results "represent a minimum estimate of his functioning level." [See AR 302, 480].  Dr. Townsend's "minimum estimate" of plaintiff's RFC was not binding on the ALJ because an RFC "is not *the least* an individual can do despite his or her limitations or restrictions, but *the most*."  SSR 96-8P, 1996 WL 374184, at *1 (italics in original).  The ALJ also noted that Dr. Townsend's conclusions were consistent with Dr. Colonna's October 2005 consultative examination report, in which she said that "there was evidence of 'gross exaggeration,' some 'answers are ridiculous,' 'effort poor,' 'poor cooperation[,]' and there was a blatant refusal to do tests and an overall contamination of the testing process." [AR 302 (citing AR 162-167)].

The ALJ provided legally sufficient reasons for his evaluation of the medical source opinions, and

1   those reasons are supported by substantial evidence in the record.   Therefore, plaintiff's contentions

2   regarding the ALJ's mental RFC finding lack merit.

3                                          **Conclusion**

4          For the reasons stated above, the Commissioner's decision is supported by substantial evidence and

5   is free of legal error.   Accordingly, the Commissioner's decision is **affirmed**.

6   **IT IS SO ORDERED.**

7

8   January 9, 2012

9

10

11                                      ANDREW J. WISTRICH
                                        United States Magistrate Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28